UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

United States of America

    v.

James Leonard

Criminal No. 21-cr-089-LM-01
Opinion No. 2021 DNH 165 P

**O R D E R**

Currently before the court is defendant James Leonard's motion to suppress (doc. no. 12). Leonard seeks to suppress evidence the police located in his condominium unit on June 12, 2018. The court held an evidentiary hearing on two days, September 16 and 30, 2021. For the reasons that follow, the motion to suppress is denied.

BACKGROUND

Having weighed the evidence presented during the evidentiary hearing, the court makes the following factual findings.

In June 2018, Leonard lived in a condominium unit on Crotched Mountain in Bennington, New Hampshire. Leonard lived in the downstairs unit, and his neighbor, Arienne Stearns, lived in the upstairs unit. On the back side of the building, Stearns's unit had a deck, and Leonard's unit opened to ground level with a patio area underneath Stearns's deck. Leonard's unit had a sliding glass door that opened onto the patio area. Leonard kept a barbeque, some outdoor chairs, and an area rug on his patio area.

In the middle of the day on June 12, 2018, Stearns heard loud noises coming from Leonard's unit. She was familiar with these noises because she had heard them on multiple occasions several weeks before and had previously reported the noises to her landlord, Roger Luby. On June 12 she again called Luby, who this time told her to call the police. She did so and shortly thereafter Bret Sullivan, Chief of Bennington Police, arrived at the condominium.

As Sullivan got out of his cruiser, he could "clearly hear a male voice screaming." Sullivan called for backup. He spoke briefly with Stearns but has no memory of speaking to her and does not recall the content of their conversation. Stearns showed Sullivan the shared entrance to her and Leonard's units through the front of the building. Sullivan knocked at Leonard's door multiple times and identified himself as a police officer. He yelled for someone to open the door. The door was locked; no one responded. Sullivan could not make out any words but could hear a male voice yelling, moaning, and screaming, and he could hear loud banging sounds as if someone's body was being thrown against the wall. He testified that, based on the nature of the screaming and noises, he "knew somebody was in trouble" and thought there "was clearly an emergency of some sort."

Around that time, Luby arrived, and Sullivan asked him to retrieve a key to access Leonard's unit. As the screaming and loud noises continued, however, Sullivan did not wait for Ruby to retrieve a key. Instead, he headed to the patio area behind the unit, as he was familiar with these condominiums and knew about the entrance on the back side. While Sullivan could not precisely characterize the

noises, he continued to think a person was in distress and needed immediate assistance. At that time, Officer Matthew Guinard of the Antrim Police Department arrived. Neither officer called for an EMT.

No path or walkway led around to the back, so the officers walked across the lawn to get to the back of the condominium. As they began walking to the back, Sullivan heard what sounded to him like vomiting. Sullivan testified that, at this point, he thought someone could have been "knocked unconscious" and in grave danger. He explained that he thought someone needed immediate assistance based on the nature of the loud noises, including the "screaming, the moaning, the vomiting, and the banging on the wall . . . ." Once they reached the back of Leonard's unit, the officers smelled "freshly burnt marijuana."

The sliding glass door to Leonard's apartment was open about six to twelve inches, but a curtain was drawn shut so the officers could not see inside. Sullivan yelled, "Bennington police, is everything okay?" When no one answered, he reached his hand through the sliding glass door and opened the curtain. Immediately inside the doorway Sullivan saw a knife and a box cutter on a table. Sullivan reached inside the door and retrieved them, out of a concern for his own safety.[1]

---

[1] Leonard testified that the knife and the box cutter were not immediately inside the doorway, but rather were closer to the bottom of a staircase. Thus, he testified that Sullivan would have had to walk approximately three steps into the apartment to retrieve the knife and box cutter. The court finds Sullivan's testimony on the location of the knife and box cutter credible. In any event, this fact is not material because it is undisputed that, by entering the back patio area, Sullivan entered the curtilage of Leonard's property. The critical question in this case is whether Sullivan's initial entry onto the patio area (when he smelled marijuana) was unlawful.

3

Sullivan then saw a man, whom he later learned was Leonard, walk out of the bathroom and stand inside the unit. Leonard was soaking wet and wearing nothing but a towel. Sullivan asked Leonard to step outside and speak with him, and Leonard obliged. Leonard gave the officers his name and date of birth. When asked about the noises, Leonard said he had been listening to music. Sullivan did not hear any music playing.

During this conversation, Chief Frederick Douglas from the Francestown Police Department arrived. The officers asked Leonard if he had been using marijuana or other drugs. Leonard denied using drugs that day, though he acknowledged that at a different point in his life, he had used heroin and gone to rehabilitation for it. Sullivan asked Leonard for consent to a search of his condominium, and Leonard declined. Sullivan told Leonard that he intended to apply for a warrant to search the condominium.

Leonard asked the officers if he could go back inside to get dressed. Sullivan told him he could reenter the condominium only if an officer accompanied him. Sullivan explained that he needed to prevent the destruction of evidence pending the execution of the search warrant. Leonard declined to reenter the condominium with an officer and remained outside in his towel. Sullivan left the scene to apply for a search warrant. Guinard and Douglas remained with Leonard at the scene. After confirming he was free to leave, Leonard returned to the front of the building, got into his truck, and eventually drove away—all still while wearing only a towel.

Later that afternoon, Sullivan obtained a search warrant for Leonard's apartment.  While executing the search warrant, officers uncovered what appeared to be marijuana and heroin, as well as what appeared to be explosive devices including a pipe bomb, detonators, gun powder, and other items used for explosives.

More than two months later, on August 30, 2018, Leonard turned himself in on an arrest warrant.  After waiving his Miranda rights, Leonard stated that, on June 12, he "was not in a very good place mentally, had consumed a large quantity of alcohol, that he was having conversations with himself."

The testimony among the witnesses at the suppression hearing was largely consistent with respect to the nature of the sounds coming from Leonard's unit on June 12.  In particular, Stearns testified that she had heard similar noises on multiple occasions several weeks earlier, though she had not called the police at those times.  On one such occasion, she made an audio recording of the noises so she could consult a friend about them.[2]  While she considered the noises on June 12 an annoyance, she stated that she called the police on that date at least partially out of a concern for Leonard's safety and well-being.  She noted that, based on the noises,

---

[2] The audio recording was played for the court at the suppression hearing. The volume was faint; Stearns testified that it was not an accurate representation of how loud the noises were because the recording was not very good quality. Having listened to the audio, the court finds the quality of the audio makes it difficult to discern any noises with clarity.  Ultimately, the court does not find the audio evidence helpful on the critical question of whether Sullivan's interpretation of the loud noises coming from Leonard's condominium was reasonable.

5

she "didn't know if he was hurt or in trouble."  She described the noises as "disturbing," and as including "screaming" and "banging on the wall."

Leonard's testimony also corroborated Sullivan and Stearns' testimony about the nature of the noises.  Leonard testified that he was upset on June 12 because the day before he had been laid off from his job at Crotched Mountain Ski Resort.  Then, on June 12, he woke up late to start a new part-time painting job.  Having lost his full-time job and perhaps a new part-time job, Leonard admitted he was angry and upset.  He conceded that, while he was in the shower, he was "screaming" about his predicament.  He also admitted that it was not unusual for him to "scream and bounce off walls."

## DISCUSSION

Leonard moves to suppress all evidence obtained by law enforcement in this matter.  He argues that the officers violated his Fourth Amendment rights by intruding onto the curtilage of his home without a warrant on June 12, 2018.  Leonard contends that once Sullivan's observations from the initial intrusion are removed from the search warrant, the warrant lacks sufficient probable cause.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. Amend. IV.  Warrantless searches are "per se unreasonable under the Fourth Amendment," unless an exception applies.  Minnesota v. Dickerson, 508 U.S. 366, 372 (1993).  The government argues that two exceptions

to the warrant requirement apply:  first, that Sullivan had an implied license to enter Leonard's curtilage and, second, that Sullivan had an objectively reasonable basis for believing that someone in the home needed immediate aid.  The court discusses each in turn.

I.  Implied License to Enter Curtilage

The area "immediately surrounding and associated with the home" is known as "curtilage."  Florida v. Jardines, 569 U.S. 1, 6 (2013) (quoting Oliver v. United States, 466 U.S. 170, 180 (1984)).  Curtilage is "intimately linked to the home, both physically and psychologically," and thus it is "part of the home itself for Fourth Amendment purposes."  Id. at 6-7 (citations omitted).

In certain instances, police have an implied license to enter curtilage without first obtaining a warrant, but "no more than any private citizen might do."  Id. at 8 (citation omitted).  Thus, custom and social norms determine whether an implied license to curtilage exists.  See id. at 9.  For example, it is customary for all manners of visitors, solicitors, and mail carriers to step onto one's porch to reach the front door.  Id. at 8.  As Justice Scalia described it in Jardines, an implied license "typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave."  Id.  Justice Scalia underscored that "[c]omplying with the terms of that traditional invitation does not require fine-grained legal knowledge; it is generally managed without incident by the Nation's Girl Scouts and trick-or-treaters."  Id.

7

The First Circuit has permitted some leeway where the circumstances suggest a front door is inaccessible to the public. See United States v. Daoust, 916 F.2d 757, 758 (1st Cir. 1990). In Daoust, the defendant's home was a log house dug into the side of a hill, and the front door was not accessible because it was five feet above ground and had no steps. Id. Officers tried knocking at a glass cellar door, and, after there was no answer, they walked up the slope of the hill to the back of the house. Id. The First Circuit held that "if [the front] door is inaccessible there is nothing unlawful or unreasonable about going to the back of the house to look for another door, all as part of a legitimate attempt to interview a person." Id.

Jardines makes clear, however, that there are spatial and temporal limits to an implied license. See 569 U.S. at 9. In his dissenting opinion in Jardines, Justice Alito—who agreed with the majority on this point—articulated the limit as follows: "A visitor must stick to the path that is typically used to approach a front door, such as a paved walkway. A visitor cannot traipse through the garden, meander into the backyard, or take other circuitous detours that veer from the pathway that a visitor would customarily use." Id. at 19 (Alito, J., dissenting).

The government concedes that, in entering Leonard's back patio area, Sullivan entered the curtilage. Doc. no. 15 at 6 n.3. The question, then, is whether Sullivan (and Guinard)[3] had an implied license to enter the curtilage. Based on the

---

[3] Guinard was with Sullivan when they entered the curtilage. Sullivan took the lead throughout the encounter, and Guinard took no independent actions material to the analysis. For simplicity, therefore, the court refers solely to Sullivan.

principles laid out in Jardines, they did not have an implied license to explore a back entrance to the condominium. After receiving no response at the front door, Sullivan walked across the lawn around the side of the condominium to Leonard's backyard. There was no path or public walkway leading to the back. Having been to these condominiums on many occasions, Sullivan knew there was a back entrance. However, there were no objective facts that would lead a visitor, such as a girl scout or a trick-or-treater, to venture to the backyard. See Jardines, 569 U.S. at 8. Moreover, unlike in Daoust, the front door of Leonard's unit was accessible. See 916 F.2d at 758. Under these circumstances, no implied license existed.

II.  Exigency: Emergency Aid

Next, the government argues that exigent circumstances justified the warrantless intrusion on Leonard's property. Specifically, the government contends that the emergency aid exception justified Sullivan stepping onto Leonard's curtilage.

One category of an exigency justifying a warrantless search is known as the "emergency aid exception." See Michigan v. Fisher, 558 U.S. 45, 47-48 (2009) (citing Brigham City v. Stuart, 547 U.S. 398, 406 (2006)). This exception is premised on the fact that the "role of a peace officer includes preventing violence and restoring order, not simply rendering first aid to casualties." Brigham City, 547 U.S. at 403. Thus, "law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from

9

imminent injury." Id. Under the emergency aid exception, officers may enter a home[4] without a warrant if there is "'an objectively reasonable basis for believing' that 'a person within [the home] is in need of immediate aid.'" Hill v. Walsh, 884 F.3d 16, 19 (1st Cir. 2018) (quoting Fisher, 558 U.S. at 47).

"Officers do not need ironclad proof of 'a likely serious, life-threatening' injury to invoke the emergency aid exception." Fisher, 558 U.S. at 49. For example, the Supreme Court has held entry was justified under this exception where officers saw the following scene through a window: a juvenile was being restrained by four adults, he broke free, hit one of them in the face, and the victim suffered a bloody lip. Id. (citing Brigham City, 547 U.S. at 406). The Supreme Court held that the bloody lip and potential future injury stemming from the altercation were sufficient to allow offers to enter to render aid. See Brigham City, 547 U.S. at 406. The Court noted that the Fourth Amendment did not require officers to "wait until another blow rendered someone 'unconscious' or 'semi-conscious' or worse before entering." Id. Moreover, officers do not need certainty that aid is needed. Unlike other types of exigencies justifying warrantless searches, the emergency aid exception does not require probable cause. Hill, 884 F.3d at 19. It requires only an "objectively reasonable basis for believing" aid is needed. Fisher, 558 U.S. at 47 (citation omitted).

---

[4] Because the curtilage is "part of the home itself for Fourth Amendment purposes," Jardines, 569 U.S. at 6, the emergency aid exception applies with equal force to the curtilage as to a dwelling itself.

10

Although the Supreme Court recently made clear that a different exception to the warrant requirement—the community caretaking exception—does not apply to searches of homes, the Court reiterated that the emergency aid exception from Brigham City is still good law. See Caniglia v. Strom, 141 S. Ct. 1596, 1599 (2021) (citing Kentucky v. King, 563 U.S. 452, 460 (2011) and Brigham City, 547 U.S. at 403-04); see also id. at 1600 (Roberts, C.J., concurring). Justice Kavanaugh concurred separately to discuss the application of the emergency aid exception. Id. at 1602-05 (Kavanaugh, J., concurring). He wrote that, for example, officers may enter a home without a warrant "where they are reasonably trying to prevent a potential suicide or to help an elderly person who has been out of contact and may have fallen and suffered a serious injury." Id. at 1603 (Kavanaugh, J., concurring).

Here, Sullivan testified that as soon as he pulled into the condominium's parking lot, he could clearly hear a male voice screaming. As he walked towards the building, he started to hear loud thuds; it sounded like someone banging on the walls and things being thrown. When he knocked on the front door to Leonard's unit, no one answered. Based on these facts, Sullivan had an objectively reasonable basis for believing that a person inside the unit was in need of immediate aid. See Fisher, 558 U.S. at 47. Sullivan did not need "ironclad proof" that the emergency was real, just an objectively reasonable belief under the circumstances. See id.

Stearns's testimony about her own concern for Leonard based on the noises supports the reasonable basis for Sullivan's belief that aid was needed. Stearns testified that she thought the noises were "disturbing" and might have indicated

11

Leonard could have been hurt. She stated she was "concerned that he might be in trouble."

To be sure, Stearns testified that she considered the noises—which she had heard several times before—a mere annoyance. She admitted that she had not called the police or an ambulance on those prior occasions. But it is not surprising that Leonard's loud noises caused Stearns to react with annoyance in addition to concern for Leonard. The fact that she waited until June 12 to call the police supports an argument that the noises may not have prompted the same degree of concern in Stearns as they did in Sullivan. Nonetheless, Stearns testified that her call on June 12 was motivated at least in part by concern for Leonard and that she found the noises to be disturbing and potentially indicative of a need for emergency aid.

Leonard's strongest argument that the emergency aid exception does not apply is that Stearns told Sullivan that she had heard Leonard making similar noises before, and thus Sullivan should have approached the situation like a noise complaint instead of an emergency.[5] However, this fact is outweighed by the other evidence. Considering the circumstances and his experience as a police officer, Sullivan reasonably thought the noises could indicate a person in the midst of a drug overdose or a person experiencing a drug-induced emergency medical need.

---

[5] Although Sullivan testified that he had no memory of talking to Stearns, Stearns testified that she told Sullivan the noises had occurred before, and the dispatch records reveal Stearns reported the same to the 911 operator. Further, Sullivan included the fact that Stearns had heard the noises before in his application for the search warrant.

See Fisher, 558 U.S. at 49 (holding that a medical concern does not need to be life-threatening for the emergency aid exception to apply). Based on the totality of evidence, the court finds that it was objectively reasonable for Sullivan to conclude that a person was potentially in danger and in need of immediate aid.

Leonard also argues that any suggestion that Sullivan was sincerely concerned about Leonard's health is belied by the fact that the Sullivan did not call emergency medical services, and that he prevented Leonard from going back inside his unit to gather some clothing without a police escort. An officer's subjective belief, however, is irrelevant. Brigham City, 547 U.S. at 404 (citing Whren v. United States, 517 U.S. 806, 813 (1996)). Indeed, the Supreme Court addressed a similar argument in Michigan v. Fisher, and stated that "even if the failure to summon medical personnel conclusively established that [the officer] did not subjectively believe, when he entered the house, that [the defendant] or someone else was seriously injured (which is doubtful), the test, as we have said, is not what [the officer] believed, but whether there was 'an objectively reasonable basis for believing' that medical assistance was needed, or persons were in danger." 558 U.S. at 49 (citing Brigham City, 457 U.S. at 406).

In summary, Leonard's Fourth Amendment rights were not violated here. The emergency aid exception to the warrant requirement applies, and Leonard's motion to suppress is denied.

## CONCLUSION

For the foregoing reasons, Leonard's motion to suppress (doc. no. 12) is denied.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

October 18, 2021

cc: Counsel of Record